UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____

)
VERTEX TOWER ASSETS, LLC            )
                                    )
              Plaintiff,            )
                                    )
v.                                  )          Civil Action No.
                                    )
TOWN OF THORNTON, NEW               )
HAMPSHIRE, and PLANNING BOARD       )
of the TOWN OF THORNTON, NEW        )
HAMPSHIRE                           )
                                    )
              Defendants.           )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND EXPEDITED TREATMENT**

For its Complaint against Defendants Town of Thornton Planning Board (the "Planning

Board") and the Town of Thornton ("Town"), Plaintiff Vertex Tower Assets, LLC ("Vertex" or

"Plaintiff"), by its undersigned attorney, upon knowledge as to its own actions and dealings and

upon information and belief as to the Planning Board and its actions, allege as follows:

**Nature of the Action**

This action arises out of the Planning Board's unlawful denial of Plaintiff's application

for site plan approval to construct a wireless communications facility that is needed in order to

remedy a significant gap in personal wireless services along and within the vicinity of NH Route

49.  A copy of the Planning Board's Notice of Decision dated April 24, 2021 (the "NOD") is

attached to this Complaint as Exhibit A.  The NOD is not supported by substantial evidence in a

written record, and is both illegal and unreasonable, insofar as it concludes that the proposed

facility would have been unsafe for emergency vehicle access, as well as having significant

stormwater impacts, despite evidence from a qualified professional engineering firm to the

contrary.  Furthermore, the effect of the NOD is to effectively prohibit personal wireless service to cover the key highway extending to the Waterville Valley Ski Area, as well as secondary roads and residences in the area.  Accordingly, the Planning Board's denial of Vertex's application violates the federal Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) (the "TCA" or "Act").  In addition to declaratory judgment, Plaintiff seeks an order from this Court directing the Planning Board to grant site plan approval for the proposed facility, and directing the Board of Selectmen to grant a Wireless Telecommunications Facility Permit, all in accordance with Plaintiff's rights under the TCA.

Vertex requests expedited treatment of this complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

## **Parties**

1.      Plaintiff Vertex Tower Assets, LLC is a Massachusetts limited liability company with its principal place of business at 155 South Street, Suite 102, Wrentham, MA 02093. Vertex is licensed to do business in the State of New Hampshire and remains in good standing as of the date of this Complaint.  As described more fully below, Vertex constructs, owns, and manages wireless telecommunications facilities that are used by national and regional wireless carriers to provide personal and advanced wireless services to end-user consumers in New Hampshire and throughout the country.

2.      Defendant Town of Thornton, New Hampshire (the "Town") is a municipal corporation located in Grafton County, New Hampshire, with its principal office located at 16 Merrill Access Road, Thornton, NH 03285.

Downs
Rachlin
Martin PLLC

3.      Defendant Planning Board is a duly authorized unit of the Town of Thornton, New Hampshire, with an address at 16 Merrill Access Road, Thornton, NH 03285.  The Planning Board has been delegated the authority, among other things, to grant site plan approval for wireless communications facilities under the Town's Telecommunications Facilities Ordinance adopted March 13, 2001 (the "Telecom Ordinance"), as well as under its Site Plan Review Regulations dated June 8, 1988 (last amended 2004) (the "SPR Regulations").

### Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because of the existence of federal questions arising under the TCA.  The Court has authority to issue declaratory judgment relief pursuant to 28 U.S.C. § 2201(a).

5.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), since the sufficiency of the Planning Board's decision under state law forms part of the same case or controversy under Article III of the U.S. Constitution.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b), since the Defendants reside in this District, and the events giving rise to this action occurred in this District.

7.      This Complaint is timely filed within thirty days of the final NOD pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

### Statement of Facts

### A. Federal Statutory Authority Over Wireless Siting

8.      Section 332 of the Act, 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of personal wireless service facilities, such as the one at issue in this case.

Downs
Rachlin
Martin PLLC

9.      The Act further provides that any person adversely affected by a state or local government's act, or failure to act, that is inconsistent with § 332(c)(7) of the Act may seek review in the federal courts and the court "shall hear and decide such action on an expedited basis."  47 U.S.C. § 332(c)(7)(B)(v).

**B. Wireless Service Industry and Site Development**

10.      Section 151 of the TCA establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications …."  47 U.S.C. § 151.

11.      Generally speaking, in order to satisfy its obligations under its radio licenses acquired from the FCC and under the Code of Federal Regulations 47 C.F.R. § 27.14(a), personal wireless service providers such as Verizon Wireless, AT&T, T-Mobile, US Cellular, and DISH Network (collectively "carriers") must have in place a system of strategically deployed "cell sites" to provide wireless communications services to their subscribers' throughout their licensed area.

12.      Each cell site consists of an antenna support structure such as a tower, building, water tank, or other structure used to elevate the antennas to the height necessary for providing adequate service to the targeted area.  The antennas are connected via cabling to radio equipment located near the antennas and/or at the base of the support structure.

4

13.     Each cell site is operated by transmitting and receiving low power radio frequency signals to and from their subscribers' portable wireless communication devices such as basic handheld phones, smartphones, tablets, and laptop aircards.  These wireless voice and data signals are then transferred through ground telephone lines, fiber, microwave or other means of backhaul transport, and routed to their destinations by sophisticated electronic equipment.

14.     Cell sites are a vital and necessary part of carriers' network infrastructure.  In order to maintain effective, uninterrupted service throughout a given area, there must be a series of cell sites, interconnected to each other with slightly overlapping coverage areas.  This allows for the subscribers to move freely about a geographic area while maintaining a consistent and reliable wireless connection to the network.

15.     A proposed cell site must consider the locations and coverage provided by the surrounding cell sites in the network, and must be located within a limited geographical area, defined in turn by factors such as terrain, land use characteristics, and population density.  By locating within a limited area and at a sufficient height, the cell site is designed to meet the targeted objectives, thereby providing reliable coverage and capacity throughout the cell.

16.     To determine where a new wireless facility is required in a given area, radio frequency ("RF") engineers use various techniques, such as sophisticated computer programs and field testing, to complete a study showing where new facilities need to be located in order to introduce or improve service.

17.     Ultimately, for a wireless network to perform reliably, cell sites must be located, constructed and operated in a manner designed to "handoff" signals from one facility to the next as a user moves along highways and roads.  If there is no functioning cell site within a given

5

area, or if the cell sites serving an area lack sufficient capacity to handle the amount of customer

demand for limited wireless spectrum, customer service will be unreliable.

18.     While carriers are ultimately responsible for making decisions on where to site

new facilities within a network, they increasingly rely on third party infrastructure developers to

provide options for improving their communications networks.

### C. Vertex Facility Infrastructure Development

19.     Vertex is a telecommunications infrastructure developer responsible for

developing, managing, and owning telecommunications facilities in strategic locations across the

country.  Vertex has worked in the wireless telecommunications industry since the 1990s, and

has the experience and expertise to address challenging siting in urban, suburban, and rural

markets.

20.     Vertex identifies, surveys, tests, and ultimately markets proposed locations for

wireless facilities in areas where reliable wireless service is lacking for national wireless carriers

who provide personal and advanced wireless services to end-user wireless consumers.

21.     Each proposed facility is typically comprised of a tower, equipment compound,

access driveway, and utility connections.

22.     Once a potential facility site is identified, Vertex markets space on the tower to

carriers.

23.     Over the past three years, Vertex has constructed five new communications

towers in New Hampshire, having received the requisite approvals from municipalities as well as

state and federal authorities, and has received municipal approvals in eleven more communities

in New Hampshire where it intends to build facilities within the next two years.  The result has

Downs
Rachlin
Martin PLLC

been and will continue to be substantial improvements to reliability of wireless service in rural and underserved areas of the State, for multiple carriers.

24.     In providing this service to carriers, Vertex is thus facilitating the development and deployment of advanced wireless and broadband connectivity consistent with the goals of the TCA.

### D. Characteristics of Proposed Facility in Thornton

25.     Based upon research and analysis by its RF engineers, Vertex determined that there is a significant gap in wireless service for virtually all national carriers, particularly along a more than three-mile stretch of NH Route 49 extending from Campton through Thornton to Waterville Valley, which serves as the principal highway used to reach the Waterville Valley Ski Area.

26.     Vertex also found a substantial service gap on Upper Mad River Road, a municipal road running parallel to NH Route 49, and which serves as an artery into several relatively dense residential subdivisions and heavily-used hiking trails in the White Mountain National Forest ("WMNF").  Vertex also identified gaps in service along portions of NH Route 175 running from north of the Circle Cross Road intersection in Thornton south approximately two miles into Campton.

27.     These gaps are significant in light of the concentration of residences and businesses in the area, as well as the considerable traffic in this region of Grafton County.

28.     As part of its due diligence, Vertex's RF Engineers concluded that there are no existing communications towers or tall structures in the general vicinity of NH Route 49 and Upper Mad River Road that could accommodate carriers to remedy the significant gap in service.

Downs
Rachlin
Martin PLLC

29.     Vertex also reviewed the location of other existing facilities in Thornton and adjacent areas of Campton and Waterville Valley to assess whether any could be modified or upgraded to address the service issues. Vertex's RF Engineers concluded that all are too far away and/or are blocked by surrounding terrain and vegetative clutter to provide service to this coverage-deficient area.  Vertex's engineers determined that a new antenna support structure needed to be located within or near this coverage gap area along NH Route 49 in Thornton.

30.     Through its due diligence, Vertex concluded that it could address the wireless service gap by constructing a new 175' self-support lattice communications tower and associated telecommunications compound (as further described herein, the "Facility") on property designated by the Town as Map 17 Lot 5 Block 21 (the "Subject Property"), owned by Michael C. Sununu and James G. Sununu, Trustees of the SMA Realty Trust (the "Property Owner").

31.     The Subject Property consists of a ±278.3 acre rectangular-shaped, undeveloped lot with a dense mostly-coniferous forest.

32.     The Subject Property is bordered to the east and north by the WMNF, and to the west by a residential neighborhood known as Sugar Run.  Upper Mad River Road runs along the Subject Parcel's southern boundary.

33.     The Subject Property has been logged in the past. An existing discontinued logging road extends approximately 1,217 feet north from Upper Mad River Road to a landing in the middle of the parcel.

34.     Following initial site design with its civil engineering firm, Vertex entered into a ground lease agreement with the Property Owner to construct the Facility at a specified location

Downs
Rachlin
Martin PLLC

on the Subject Property and received the necessary authorizations from the Property Owner to proceed with obtaining land use permits for the Facility.

### E. Alternatives Considered

35.     Prior to commencing the permitting process for the Facility, Vertex thoroughly investigated other alternative site locations, but no alternative to a new tower on the Subject Property proved to be available or viable to remedy the coverage gap along NH Route 49.

36.     Vertex Plaintiff considered alternatives at many different locations, including but not limited to the following: C Broad Place (Map 13 Lot 5 Block 3); 80 Orris Road (Map 13 Lot 5 Block 2); 263 Sandwich Notch (Map 18 Lot 2 Block 2.2); 655 Upper Mad River Road (Map 17 Lot 5 Block 2.2); Off Mad River Road (Map 17 Lot 5 Block 2.2); 236 Pegwood Road (Map 4 Lot 4 Block 11); 749 NH Route 49 (Map 17 Lot 7 Block 20); 252 Upper Mad River Road (Map 17 Lot 7 Block 2); Off Ulman Drive (Map 16 Lot 6 Block 8); 13 Turner Road (Map 16 Lot 7 Block 37); 145 Upper Mad River Road (Map 16 Lot 7 Block 66); Bear Ridge Road (Map 16 Lot 7 Blocks 58 and 50); and Fondue Avenue (Map 17 Lot 1 Block 3.20).  Ultimately Vertex ruled out each of these candidates  due to lack of landowner interest, insufficiency of wireless coverage, or both.

37.     During its investigation, Vertex also considered whether other locations on the Subject Property would  suit the Facility. Ultimately it determined that only a 175' tower at the specified location of N 43˚ 53' 33.47", W 71˚ 36' 21.11" would effectively address the coverage deficiency in the vicinity of NH Route 49 and accommodate multiple carriers.

Downs
Rachlin
Martin PLLC

**F. Town of Thornton Requirements for Wireless Facilities**

38.     The Town of Thornton regulates the siting of personal wireless facilities pursuant to the Telecom Ordinance and the SPR Regulations.

39.     Under the Telecom Ordinance, all applications for a "new ground mounted facility" (i.e., a new tower) must undergo site plan review through the Planning Board, as modified by telecommunications-specific provisions in the Telecom Ordinance.

40.     Any requests from an applicant for a variance from the Telecom Ordinance are subject to review by the Zoning Board of Adjustment ("ZBA"), consistent with RSA 674:33. The ZBA is also provided the authority in Section 10 of the Telecom Ordinance to waive certain provisions prior to Planning Board review.

41.     Once an application is approved by the Planning Board (including with any variances or waivers obtained from the ZBA), it is subject to additional review by the Board of Selectmen.

42.     If approved, the Board of Selectmen will issue a Wireless Telecommunications Facility Permit, allowing construction to proceed.

43.     The Telecom Ordinance contains detailed, demanding requirements for vertical height, property setbacks, visual impacts (including tower design type, vegetative buffers, undergrounding of utilities, and absence of lighting), and security barriers, among other design and performance standards.

44.     The Telecom Ordinance also requires extensive documentation for new ground mounted facilities regarding the proposed coverage area, and the alternatives investigated as part of the applicant's due diligence.

10

45.     Importantly for this action, Section 6(P) of the Telecom Ordinance is the only

provision related to fire safety at new ground mounted facilities:

> All facilities shall be designed and operated in a manner that minimizes the risk of
> igniting a fire or intensifying one that otherwise occurs. The Town of Thornton reserves
> the right to have the Campton/Thornton Fire Chief, or at the expense of the owner of the
> facility, contract with a structural engineer licensed in New Hampshire of their choice,
> inspect the facility yearly. If, upon inspection, the Town concludes that a facility fails to
> comply with such codes and standards constitutes a danger to persons or property , then
> upon notice being provided to the owner of the facility, the owner shall have thirty (30)
> days to bring such facility compliance within thirty (30) days such action shall constitute
> grounds for the removal of the facility in accordance with Section 8 [of the Telecom
> Ordinance] at the owners expense through execution of the posted security required by
> Section 7 [of the Telecom Ordinance].

46.     The Telecom Ordinance also contains only one provision —Section 6(J)—

concerning access driveway design, requiring that (i) driveway permits be obtained from either

the New Hampshire Department of Transportation or the Town, as appropriate based on the road

classification; (ii) the applicant use existing entrances and driveways to serve a facility; (iii) a

curve be installed at the driveway entrance so that it is not visible from the adjacent road; (iv) a

gate be installed immediately after the curve; and (v) that the access driveway width be no

greater than 12' in width, with a 1 ½' crushed gravel surface.

47.     The Telecom Ordinance does not address wetlands, drainage, fire safety, or access

driveways, other than the cited provisions.

48.     The SPR Regulations contain multiple submission requirements for proposed

development of all types, without any telecommunications-specific provisions.

49.     Among the submission requirements is a storm drainage plan showing "the

existing and proposed methods of handling normal and storm runoff, including the location,

Downs
Rachlin
Martin PLLC

elevation and size of all catch basins, dry wells, drainage ditches, swales, culverts, retention basins, and storm sewers."  SPR Regulations § V(A)(15).

50.     Where a proposed development is required to obtain an "Alteration of Existing Terrain" permit to state authorities pursuant to RSA 149-8:a (hereinafter "AoT Permit"), those plans are to be provided as part of the site plan review application, and are automatically deemed to satisfy the Planning Board's requirements.  SPR Regulations § V(A)(15).

51.     The SPR Regulations also contain a requirement that storm drainage at the site of new development "be designed for at least a 25-year flood…."  In turn, for any developments creating more than ½ acre of impervious surfaces (including gravel roads), the applicant is required to demonstrate that post-development peak flows at the property line will be detained at the level of a 2- and 10-year storm event in a pre-developed condition.  SPR Regulations § VI(C)(1).

52.     Of importance, the SPR Regulations contain no other standards for construction of driveways, nor do the SPR Regulations distinguish in any way between development designed for regular access (e.g., residential, commercial, industrial buildings) versus unmanned uses (e.g., telecommunications facility, ground-mounted solar generators).

### G. Site Plan Application and Proceedings before the Planning Board

53.     On August 25, 2020, Vertex submitted its application for Site Plan Review to the Planning Board for the Facility on the Subject Property, complete with extensive documentation on coverage, aesthetics, alternatives, radiofrequency emissions, and other features (the "Application").

Downs
Rachlin
Martin PLLC

54.     On August 8, 2020, Vertex had submitted a separate application to the ZBA to waive the prohibition against telecommunications facilities in a residential zone, and to secure variances for (i) height in excess of 100 feet (due to coverage needs); (ii) a vegetative buffer away from the fence line (due to tree cover on the Subject Property); (iii) undergrounding of utilities (to reduce soil disturbance and overall costs); and (iv) use of a lattice tower (to reduce the overall visual impact compared with a monopole design).

55.     The two separate applications gave rise to parallel proceedings that ultimately resulted in a total of six public hearings before the ZBA between August 24, 2020 and January 11, 2021, and seven public hearings with the Planning Board from September 17, 2020 through April 15, 2021.

56.     The ZBA proceedings culminated in a decision on December 3, 2020 to grant the four variances and the waiver request for the Facility.

57.     During the ZBA public hearing process, the ZBA retained an independent radio frequency expert.  The ZBA's expert reviewed all of the data submitted by Vertex, requested and received supplemental data, and conducted his own analysis.  The ZBA's expert concluded that there are indeed substantial gaps in wireless coverage in Thornton along NH Route 49 and Upper Mad River Road, as well as some of the adjoining roads.

58.     Vertex supplied copies of the expert's report to the Planning Board for review.

59.     Although the minutes of the Planning Board hearing reflect active dialogue with Vertex's representatives and the public on multiple facets of the Project, the pertinent elements summarized below include:  (A) location of the access driveway; (B) concerns over emergency vehicle access; and (C) alternative locations / designs for the Facility.

13

Downs
Rachlin
Martin PLLC

*A. Access Road Effects*

60.     As set forth in the original Application, Plaintiff had proposed to access the Facility using a new to-be-constructed access driveway over an undeveloped abutting property located on Treeline Road in the Sugar Run neighborhood, on a lot adjacent to the Subject Property (the "Treeline Lot").  The initially proposed access driveway is referenced herein as the "Treeline Access Driveway."

61.     Vertex had entered into a purchase and sale agreement with the owner of the Treeline Lot in order to proceed with constructing the Treeline Access Driveway.

62.     Consistent with the SPR Regulations, Vertex's professional civil engineering firm—Pro-Terra Deign Group, LLC ("Pro-Terra")—prepared a seventy-seven page drainage report documenting in extensive detail the existing drainage patters on the Subject Property and the Treeline Lot, as well as a series of measures such as water bars, riprap check dams, ditch turnouts, plunge pools, and dewatering basins employed to address and prevent runoff from the Treeline Access Driveway.

63.     These measures are also reflected in Pro-Terra's initial site plans and erosion control drawings for the Treeline Access Driveway.

64.     The drainage report and the site plans together demonstrated that the Treeline Access Driveway would meet the peek runoff requirements in the SPR Regulations by achieving equal or slight decreases in post-construction runoff for 2-year-, 10-year-, 25-year-, and 100-year storm events.

65.     As Pro-Terra explained in the drainage report, the differences in pre-and post-construction peak flow showed that the scale of the improvements (i.e., disturbances on less than

14

1% of the entire Subject Property area) within the overall watershed would not impact

downstream areas.  As further explained in the report, this result was typical for other wireless

communications facility projects on similar properties elsewhere in New Hampshire.

66.     During the October 15 public hearing, Planning Board members, as well as

members of the public, expressed concern that the proposed Treeline Access Driveway could

introduce additional traffic into a residential neighborhood (despite the infrequent need for

maintenance visits), or lead to increased hiking activity, ATVs, and/or snowmobile usage on the

Subject Property (in spite of Vertex's plans to gate the Treeline Access Driveway and post the

property to prevent trespassers).

67.     As reflected in the meeting minutes, the Vice Chair of the Planning Board opined

to Vertex's attorney, Francis Parisi, Esq., that "the logging road currently located on Upper Mad

River Road can be used, rather than needing another parcel to access the site."  [PB Minutes of

09/17/2021 at 3.]  The Chair of the Planning Board also pressured Vertex to use the existing but

decommissioned logging driveway off of Upper Mad River Road (the "UMRR Access

Driveway").

68.     Attorney Parisi made clear at the October meeting that the UMRR Access

Driveway would require a longer and more invasive driveway, all at a substantially greater cost

to Vertex.

69.     Notwithstanding Vertex's initial position, at a subsequent meeting held on

November 19, 2020, Mr. Parisi communicated to the Planning Board that Vertex was willing,

based on comments from the previous public hearing, to shift to the UMRR Access Driveway by

substantially improving the existing logging road.

Downs
Rachlin
Martin PLLC

70.     Vertex's representative cautioned that the UMMR Access Driveway would require switchbacks (due to the slopes beyond what the company would typically be comfortable using for construction), as well as activity more proximate to wetlands than was true of the Treeline Access Driveway.

71.     Mr. Parisi noted that Vertex would be required to obtain an AoT permit from the New Hampshire Department of Environmental Services ("NHDES"), as well as wetland crossing permits, so that the site plans would require substantially greater detail than what is typically included for Planning Board site plan review.

72.     Although the Planning Board members did not promise to approve the Project with the UMRR Access Driveway—in particular pending a decision from the ZBA on variances and a waiver—the minutes reflect that the Planning Board members expressed gratitude for Vertex's agreement to investigate the UMRR Access Driveway as an alternative to the Treeline Access Driveway.

73.     On December 3, 2020, the ZBA voted to approve the waiver and variances required by Vertex to construct the Facility as designed.

74.     The ZBA Notice of Decision specifically included a condition that "any and all access to the facility must be on Upper Mad River Road only."

75.     At the Planning Board hearing on January 21, 2021, Mr. Parisi indicated affirmatively that the Facility would be accessed using the UMRR Access Driveway, not the Treeline Access Driveway, based on multiple visits over the last few months by Vertex's engineers and surveyors to walk the property and document the impacts.

Downs
Rachlin
Martin PLLC

76.     At the request of the Planning Board, Vertex consulted with the Town of

Thornton Conservation Commission regarding the Facility and specifically the use of the UMRR

Access Driveway.  On December 14, 2020, representatives of Vertex's civil engineering and

wetlands biologist firms met with representatives of the Thornton Conservation Commission on

site and walked the full length of the access road.

77.     One of the Planning Board members read into the public hearing record the

content of a letter from the Chair of the Thornton Conservation Committee discussing the

December 14, 2020 site visit , including the following passage:

> The [Thornton Conservation Committee ("TCC")] members in attendance of this site
> walk were duly impressed with the thoroughness of the contractors' plans for the access
> road, clearly marking all wetland areas and their plan to take actions to minimize impacts
> upon the wetlands and other natural features.  Pending compliance with all [NH]DES and
> other applicable rules and regulations, the TCC members agree with the plan set forth by
> the contractors.  Going forward, the TCC will review the wetland permit prior to
> submittal to [NH]DES.

78.     At a public hearing held on February 18, 2021, Vertex submitted new site plans

showing the UMRR Access Driveway with a very high level of detail intended for review by

NHDES (for the AoT Permit) and the U.S. Environmental Protection Agency ("EPA") (in

connection with National Pollutant Discharge Elimination System ("NPDES") requirements for

stormwater discharges).

79.     Since SPR Regulations § V(A)(15) state that plans for an AoT permit are

sufficient to satisfy municipal standards, Vertex had no reason to believe that its revised site

plans would be insufficient in any way.

80.     Tom Johnson from Pro-Terra reviewed with the Planning Board the extensive

erosion control plan that included water bars to collect runoff from the driveway, stone-lined

17

vegetated swale to channel to culverts under the driveway into check dams, and the proposed detention basis designed to release water to match the pre- and post-construction runoff requirements of the SPR Regulations.

81.     Mr. Johnson noted that the components were all designed based on the extensive drainage plan that had been developed for the Subject Property, and confirmed that the swales would cause no runoff impacts to any neighboring properties.

82.     Mr. Johnson also confirmed that the UMRR Access Driveway had been designed to address—at a minimum—a 25-year storm event.

83.     The Planning Board Chair, Steven Babin, noted that certain members of the public continued to have concerns regarding runoff, but voiced that state and federal permitting processes would subject the access driveway design to an extensive thorough review, thus ensuring that the design would prevent runoff on to neighboring properties.

84.     Vertex acknowledged to the Planning Board that, once federal and state approvals had been obtained, a driveway permit would be required from the Town prior to construction, thereby ensuring that the Code Enforcement Officer would review the actual construction of the UMRR Access Driveway.  Vertex further acknowledged that a bond would be required for construction, consistent with the SPR Regulations.

85.     After some discussion at the February hearing, the Planning Board considered whether to seek a quote for an independent engineering review of the driveway, notwithstanding the Chair's position regarding the additional forthcoming review of the UMRR Access Road by state and federal regulators.

18

Downs
Rachlin
Martin PLLC

86.     At the next subsequent Planning Board meeting on March 18, 2021, Chairman Babin reported having received the independent engineering review quote, but concluded that there was no necessity for independent review given the upcoming review of the site plans by NHDES and EPA.

87.     When asked by a member whether Vertex would accept Planning Board approval of the Application subject to obtaining all state and federal permits, Mr. Parisi responded in the affirmative.

88.     Shortly thereafter, the Planning Board voted to accept the modified Application (with the site plan showing the UMRR Access Driveway at the NHDES / EPA level of detail) as complete, thereby commencing final deliberations.

89.     At no point in the Planning Board public hearing process did the members discuss or suggest that the UMRR Access Driveway plans were deficient in any way, nor that the design would negatively impact the Mad River watershed.

90.     No member of the Planning Board expressed concern or disagreement with the Thornton Conservation Commission's characterization as to the thoroughness of the proposed plans to address stormwater runoff from the UMRR Access Driveway.

### B.      *Emergency Vehicle Access*

91.     A second element of the Planning Board's review of the Facility concerned the suitability of the UMRR Access Driveway for emergency vehicles.

92.     During the Planning Board and ZBA public hearing process, both entities received letters of support for the Facility from several public safety agencies, including the

Downs
Rachlin
Martin PLLC

Lakes Region Mutual Fire Aid, the Campton-Thornton Fire Department, and the Town of Thornton Police Department.

93. The letters all underscored the need for a new tower to provide wireless coverage on NH Route 49 and adjoining streets and neighborhoods as a matter of public safety, while also expressing an interest in collocating antennas and radio equipment at the Facility rent free once constructed to enhance each agency's communications' networks. (The ZBA's approval of the Project includes this 'rent-free space' condition.)

94. In none of the letters did any public safety agency express concern with use of the access driveway to reach the Facility.

95. During the February 2021 public hearings before the Planning Board associated with Vertex's shifting to the UMRR Access Driveway instead of the Treeline Access Driveway, a concern arose regarding the fact that portions of the UMRR Access Driveway would have slopes of 18% and 20%, potentially posing an issue for vehicle access.

96. In response to the concern regarding steep sections of the driveway, Tom Johnson of Pro-Terra explained to the Planning Board that the site had been designed with controls and safeguards to safely transport the equipment components up to the compound from Upper Mad River Road without accident, particularly for the one-week period where initial tower construction would take place. Following construction, only small vehicles would be used to access the Facility for technician visits.

97. On March 1, 2021, at the request of the Planning Board, Fire Chief Daniel Defosses submitted a letter expressing his opinion that an emergency during winter conditions (i.e., before snow and frost left the road) area public safety agencies could not traverse the

20

Downs
Rachlin
Martin PLLC

sections of the UMRR Access Driveway with its tracked vehicle, given that the road would not be plowed to allow access via snowmobile.  Chief Defosses also expressed concern regarding extinguishing fires.

98.     At the March 18, 2021 public hearing, Mr. Parisi addressed Chief Defosses's letter noting that the Facility—like other unmanned cell sites in the area such as those at Waterville Valley—are not designed to be readily accessible by emergency vehicles.  Instead, sites are designed to be addressed by trained technicians equipped to address fire and life safety concerns specific to wireless facilities.

99.     Mr. Parisi explained that Vertex and others were accustomed to installing facilities on similar slopes at mountainous sites throughout New Hampshire.

100.     In response to questions at the March hearing regarding the risk of fire, Vertex explained and later provided a detailed written explanation regarding the measures in place to reduce fire risks at wireless facilities, including use of non-combustible, heat sensitive equipment, venting systems, and an extensive series of equipment alarms that include automatic or remote shutoff capabilities.

101.     Mr. Parisi also explained that clearing distances from vegetation, laying down of gravel in the facility compound, and use of communications-specific grounding systems were also used to mitigate the incidence of fire at remote wireless facilities.

102.     During the public hearing process, the Planning Board never expressed reservations or concerns regarding Vertex's explanations regarding steep slopes, nor did the Board ever seek further clarification from Chief Defosses or other qualified personnel in response to the issue.

Downs
Rachlin
Martin PLLC

103.     Neither Planning Board members nor members of the public presented evidence to controvert Vertex's materials showing that the Facility would be "designed and operated in a manner that minimizes the risk of fire" for purposes of Section 6(P) of the Telecom Ordinance.

### C.     Alternative Locations / Designs for the Facility

104.     A final element of the Planning Board's review concerns alternative designs and/or locations for the Facility.

105.     Although not referenced in the NOD, a core element of the Planning Board's role under the Telecom Ordinance is to review materials regarding alternatives analyzed, both on and off the Subject Property.  See SPR Regulations §§ 4, 5, 6, 9(B)(4)-(5), 9(C)-(E).

106.     Over the course of the Planning Board hearings from September 2020 through April 2021, Vertex at numerous times discussed its evidence submitted with the Application regarding the lack of alternative sites, including off-site and on-site locations suitable to address the coverage gap.

107.     The discussions included an explanation regarding why a series of smaller structures were not a technically or economically viable alternative to the Facility, and why alternate tower designs such as "monopoles" and stealth facilities would not suffice.

108.     Vertex engaged in the discussion with the Planning Board members and members of the public attending the hearings, even though jurisdiction over elements of these considerations rested with the ZBA per the variance and waiver applications.

109.     At the March 18, 2021 hearing where the Planning Board accepted the Application as complete, all members voted in favor, with no one alleging any concern over the alternatives analysis requirements of the Telecomm Ordinance.

Downs
Rachlin
Martin PLLC

110.    No participants at any of the public hearings—including members of the Planning Board and members of the public—introduced evidence demonstrating the existence of suitable, viable alternatives to the proposed Facility at the Subject Property.

111.    In summary, Plaintiff's decision to press forward with site plan review of the Facility at the Subject Property was justified because (1) the Facility was sufficiently proximate to the NH Route 49 search area to remedy a significant gap in wireless service for Verizon Wireless and other nationally-recognized wireless service providers; (2) the Property Owner was willing to lease a portion of land for the construction of the Facility; (3) the Facility received a variance and appropriate waivers from the ZBA based on demonstrated need and exhaustion of alternatives; (4) the Facility could be accessed by modifying an existing access driveway from Upper Mad River Road, subject to obtaining approvals for alteration of terrain and stormwater discharges from NHDES and EPA, thereby addressing the Planning Board's core identified concern during the preliminary proceedings; and (5) the Facility's design for construction access and fire safety was consistent with other similar facilities around New Hampshire.

**H. Notice of Decision**

112.    At the close of the hearing on April 15, 2021, the Planning Board voted to deny the Application by unanimous vote.

113.    Two separate bases were provided in the NOD for denying the Application: (1) public safety due to steep slopes and fire risk; and (2) stormwater runoff impacts.

114.    First, with regard to public safety, the Planning Board concluded that the proposed driveway presented "significant life safety concerns" due to having "areas that are at a

Downs
Rachlin
Martin PLLC

20% grade," meaning that "emergency and safety vehicles will not be able to respond to the site in the event of an emergency."

115.    The Planning Board based its conclusion on what it characterized in meeting minutes as "statements made by Vertex, public safety officials, and members of the public," without any discussion of the evidence presented to the contrary.

116.    In fact, the Planning Board ignored evidence in the record that the fire risk posed by the Facility is extremely limited due to the absence of hazardous materials, and the precautions used to contain and suppress electrical fires in the highly unlikely event they should occur.

117.    The Planning Board further ignored the measures addressed by Attorney Parisi to address fires and other emergencies at communications facilities similar to the proposed Facility at mountainous sites.

118.    Moreover, evidence in the record supports that the concern expressed regarding emergency vehicle access to the Facility was based on a narrow concern for winter access, without regard to the limited nature of access required for an unmanned facility at a remote location during winter conditions.  The Planning Board mistakenly and unlawfully inferred that the Chief's concern applied to non-winter conditions.

119.    Vertex's position is supported by the fact that local first responders—including the Thornton Police Department, the Campton-Thornton Fire Department, and the Lakes Region Mutual Fire Aid—all supported the Project from a public safety perspective, including for future intended collocation of equipment on the tower for communications purposes.

Downs
Rachlin
Martin PLLC

120.    At a minimum, the Planning Board should have reopened the public hearing for further information / clarification on the emergency access concern.

121.    Even so, as set forth in the record, there was insufficient evidence to find that the Facility had not been "designed … in a manner that minimizes the risk of fire…" as required by the Telecom Ordinance.

122.    Second, with respect to runoff, the Planning Board concluded that the Project "poses significant environmental concerns," by "not properly address[ing] storm water drainage and mitigation."  Specifically:

> The evidence presented to the Board shows that there is a heightened risk of flooding using the storm water mitigation currently being proposed, which will negatively impact the Mad River watershed.  Although the proposal does attempt to account for a 25-year event, this is the minimum requirement under the Site Plan Regulations, and the Board has the right, and indeed the obligation, to require a greater level of storm water mitigation depending upon the property under review.

123.    As reflected in the draft minutes of April 15, the Planning Board Chair based its statement on "evidence provided to the Board that would suggest the Mad River watershed will be impacted from excessive runoff from the proposed tower site," but without identifying the source of evidence, and without any consideration of the materials provided by Pro-Terra to the contrary.

124.    In relying on storm water impacts on the Subject Property for the NOD, the Planning Board completely ignored substantial evidence in the written record that Vertex had taken significant and extensive steps to design the UMRR Access Driveway to meet the demanding requirements, as well as the statements of Vertex's civil engineer that the UMMR Access Driveway would not create off-site stormwater runoff.

Downs
Rachlin
Martin PLLC

125.    The Planning Board even read aloud into the public record the Thornton Conservation Commission's letter acknowledging the significant work that had been done to address runoff, without any member expressing objection.

126.    The Planning Board made clear that it would condition its approval on Vertex obtaining NPDES and AoT permits in order to address any additional required details, consistent with SPR Regulations V(A)(15).

127.    Never once during the public hearing process did the Planning Board request that Vertex provide storm water mitigation details at anything more than a 25-year storm event, nor did it ever ask for additional information regarding stormwater design.

128.    Fundamentally, Vertex moved its access driveway from the Treeline Lot to the UMRR Access Driveway in response to the ZBA and Planning Board's request, all to address concerns from residents of the Sugar Run neighborhood, and in spite of designing the Treeline Access to ensure that drainage would be equal to or less than existing conditions (with additional review to be conducted by NHDES and EPA), while meeting minimum requirements for 25 year storms.

129.    In light of the NOD, the Planning Board's failure to ask for additional information on both stormwater runoff as well as public safety during the public hearings is unreasonable, considering (i) the provision of the SPR Regulations requiring both a performance bond and a municipal site inspection for construction of the access road (to ensure against excessive runoff); (ii) the evidence presented regarding fire-safety measures, and the seasonal limitation to Chief Fosses's stated concern; (iii) the recognized and demonstrated public good of the project for both

26

Downs
Rachlin
Martin PLLC

wireless customers and public safety agencies; (iv) the Thornton Conservation Commission's positive report following its site walk; and (v) the absence of alternatives.

130.    In short, Plaintiff complied with all applicable procedural and substantive requirements of the Telecom Ordinance and the SPR Regulations, and was denied site plan approval without evidence that a reasonable trier of fact could reasonably rely upon to reach their conclusions, in particular concerning the access driveway and the lack of risk to public safety.

131.    Fundamentally, Vertex made significant changes to its proposed access to the Facility in response to concerns expressed by the Planning Board members and attendees at the public hearing, with consensus that any subsequent review of stormwater characteristics could be refined through the NHDES and EPA processes (and without need for independent review), and with an understanding that emergency vehicle access would not be needed.  The Planning Board inexplicably reversed course on this issue in deliberations, relying on evidence not in the record or of insufficient basis to overcome the weight of evidence from Vertex's representatives.

132.    Furthermore, the Planning Board ignored or refused to consider the Telecom Ordinance's stated policy to "permit the siting of facilities on new ground mounted structures … where all other reasonable siting opportunities have been exhausted …."  Telecom Ordinance § I(D).

## COUNT I
**(Violation of 47 U.S.C. § 332(c)(7)(B)(iii) -
Failure to Support NOD with Substantial Evidence in the Written Record)**

133.    Plaintiff incorporates by reference and reallege the foregoing factual allegations in paragraphs 1 through 132 as if fully set forth herein.

Downs
Rachlin
Martin PLLC

134.     The TCA generally preserves the power of local land use boards to make decisions with respect to the siting of telecommunications facilities, but it preempts local decisions to the extent they conflict with the TCA.

135.     Vertex's Application constitutes a request to site a facility for "personal wireless services" within the meaning of the TCA, and, as such, is entitled to protection of the TCA.

136.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii): "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

137.     The Planning Board's NOD in this case did not satisfy the "in writing" requirement because it does not explain the denial with sufficient discussion of the evidence relied upon to reach its conclusions.

138.     Even assuming the notice of decision is an adequate "writing" when supplemented with the minutes from the seven meetings devoted to the Application, the Decision is not supported by substantial evidence for the reasons set forth herein.

139.     Accordingly, the Planning Board's action constituted a violation of the TCA, is preempted, and should be set aside and enjoined.  Further, the court should issue an order requiring the Planning Board to grant approval for its project.

<u>**COUNT II**</u>
**(Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) –**
**Effective Prohibition of Personal Wireless Service)**

140.     Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 139 as if fully set forth herein.

Downs
Rachlin
Martin PLLC

141.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(i)(II), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government of instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

142.     Based on predictive radiofrequency analysis and drive-test data collected and presented by Vertex's radiofrequency engineers, the nationally-recognized wireless communications carriers have a significant gap in personal wireless service along NH Route 49.

143.     Vertex presented engineering-based evidence into the record demonstrating that the gap cannot be remedied without a new tower facility, as opposed to an alternative technological solution.

144.     There is no existing structure or property in or near the search area in the vicinity of the Facility that is both reasonably available and technologically feasible to remedy the significant gap in personal wireless service in the area.

145.     Plaintiff thoroughly investigated multiple alternative properties in and around the area within which it determined that a wireless communications facility must be located to remedy the significant gap in service.

146.     Plaintiff produced these materials with the Application to the Planning Board; the Planning Board reviewed and asked questions on the alternatives, while also remaining aware of parallel discussions taking place with the ZBA.

147.     Plaintiff also provided materials to the Planning Board regarding other locations on the Subject Property for potential placement of the wireless facility, and determined that the proposed Facility is the only location suitable to remedying the coverage gap.

Downs
Rachlin
Martin PLLC

148.    Neither the Planning Board nor any of the participants in the public hearings identified a viable alternative over the course of a total of seven hearings concerning the Project.

149.    The ZBA issued variances and a waiver based in significant measure on Plaintiff's evidence concerning the suitability of the proposed Project on the Subject Property for remedying the identified coverage gap, and the lack of available alternatives.

150.    Plaintiff demonstrated that the proposed height of the facility is needed to ensure sufficient space for multiple wireless carriers, given that each antenna array must be separated by a minimum of ten vertical feet, while maintaining space for public safety agencies per a condition of the ZBA.

151.    The Board denied the Application for the Proposed Facility, with little or no consideration to the evidence presented regarding the absence of alternatives, and with seeming disdain for the public safety concerns underlying the need to provide reliable coverage along NH Route 49.

152.    Because there are no viable alternatives to the Proposed Facility that will remedy the significant gap in service for wireless coverage, the NOD effectively prohibits Vertex from building the infrastructure necessary to accommodate personal wireless services for carriers in the intended search area.

153.    Consequently, the NOD of the Application is in violation of, and preempted by, Section 332(c)(7)(B)(i)(II) of the TCA, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order directing the Planning Board to approve the Application for the Facility, and to order the Town to issue a Wireless Telecommunications Facility Permit allowing construction.

Downs
Rachlin
Martin PLLC

<u>COUNT III</u>
**(RSA 677:15, I and 28 U.S.C. §1367 Supplemental Jurisdiction -
Appeal of Illegal and Unreasonable Decision of the Thornton Planning Board)**

154.    Plaintiff incorporates by reference and reallege the foregoing factual allegations in paragraphs 1 through 153 as if fully set forth herein.

155.    Plaintiff, as the applicant for site plan review approval, is a "person aggrieved" by the NOD, because it cannot proceed with construction of the Facility based on the Planning Board's decision, despite having received variances and a waiver from the ZBA.

156.    The NOD is illegal and unreasonable under RSA 677:15, I for substantially the reasons described in Counts I and II, to wit: the Planning Board lacked evidence to find that the unmanned, remote Facility posed a public safety risk due to steep slopes and fire concerns, and that the UMRR Access Driveway would lead to excessive runoff in the Mad River watershed.

157.    The NOD is also illegal because it relies on standards for driveways not set forth anywhere in the SPR Regulations or the Telecom Ordinance, as well as applying a stormwater threshold above the 25-year storm set forth in the SPR Regulations.

158.    Because the Planning Board knew or should have known that the Application was subject to the limitations of the TCA (including the effective prohibition clause), and was aware that Plaintiff had exhausted alternatives relative to the proposed location for the Facility (as required by the Telecom Ordinance), the Planning Board failed to consider the effect of its determinations regarding stormwater and steep slopes, and thus violated its obligations under both federal and New Hampshire law.  *Daniels v. Town of Londonderry*, 157 N.H. 519 (2008); 47 U.S.C. § 332(c)(7)(B)(i)(II).

Downs
Rachlin
Martin PLLC

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

1.      An expedited review of the matters set forth in this Complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v);

2.      A judgment that the Planning Board's NOD violated the TCA and New Hampshire law, and is therefore void and invalid;

3.      An order requiring the Planning Board to grant the Application and thereby approve the Facility;

4.      An order directing the Town to issue a Wireless Telecommunications Facility Permit, together with any and all other ancillary municipal approvals and permits necessary for Plaintiff to proceed with construction of the Facility;

5.      An award of Plaintiff's costs, including reasonable attorneys' fees; and

6.      Such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

VERTEX TOWER ASSETS, LLC


By its attorneys,

*/s/ William J. Dodge*
William J. Dodge (NH No. 16395)
wdodge@drm.com
Downs Rachlin Martin PLLC
P.O. Box 190, 199 Main Street
Burlington, Vermont 05402-0190
Telephone: (802) 863-2375
Facsimile: (802) 658-0905

Dated:  May 24, 2021

20636212.1

32

Downs
Rachlin
Martin PLLC